## COMPENSATION FOR SERVICES RENDERED IN BEHALF OF A PUBLIC TRUST.

Superior Court of Cincinnati.

TRUSTEES OF THE CINCINNATI SOUTHERN RAILWAY v. WASHINGTON T. PORTER.

Decided, November 18, 1918.

*Construction of Contract for Services of Attorney—Fixing of Compensation by Trustees After Rendition of Services Contrary to Public Policy—Effect on Public Interest to be Tested by Evil Tendencies Rather than the Actual Injury Suffered—Interpretation of Contract from Conduct of the Parties—Value of Attorney's Services in Appropriating Property More than One Million Dollars in Value.*

1. Where an attorney at law is employed by a board of trustees of a public trust at a fixed amount per month under a resolution "subject to the will and pleasure of the board both as to the term of service and rate of compensation," the board may terminate the employment at any time, or continue the employment and change the rate of compensation. If the board changes the rate of compensation, it is incumbent on the part of the board of trustees to give expression to its will and pleasure by a resolution or order equally formal and equally well authenticated and made *before* any services are rendered under the changed rate.

2. Public policy forbids public officials definitely fixing a certain sum to be paid for services to be rendered to the public and at the same time reserving to themselves the arbitrary power to add to the sum named in a contract *after* the services are rendered.

3. Compensation for services rendered by an attorney at law to a public trust must be moderate, more so perhaps than if rendered to an individual or private concern. The measure of such value is dependent upon the onerous and exacting character and nature of such services, their amount, the amount of money involved, the time actually consumed, the skill and ability required and displayed, the responsibility involved, actual trial work and negotiations, if any, apart therefrom, and the beneficial results to such trust due directly to such service.

*Harmon, Colston, Goldsmith & Hoadly and John Weld Peck,* for plaintiffs.

*Rufus B. Smith,* contra.

GUSWEILER, J.

This is a proceeding brought in this court by petition filed January 23, 1907, by the Trustees of the Cincinnati Southern Railway against Washington T. Porter, in which the plaintiff board seeks a decree fixing the amount of compensation due the defendant for certain legal services rendered to them as such trustees. The plaintiffs prayed that, on the payment of the amount so fixed, the defendant be required to release and discharge the plaintiffs from all claims and demands by reason of said services. The case was tried on its merits at that time by a learned former judge of this court, who made a finding which was sustained and approved by the circuit court of this district and was then taken to the Supreme Court, which court of last resort set aside the findings of the two lower courts and remanded the case back to this court for further proceedings.

The Supreme Court found it to be error on the part of the courts below to hold that the board of trustees had conclusive right under the resolution of 1894 to determine the question of additional compensation "*after*" the work was done. It held that the defendant should have been permitted to show, if he could have done so by legal testimony, that the services in question were not rendered pursuant to the resolution in question, and, if they were not, he should have been permitted to prove the value of those services.

Thus the cause has come on to be heard on these issues by this court, and by agreement of counsel it was heard and argued orally for several days, the printed record, pleadings, briefs, etc., being submitted in lieu of witnesses being heard. After long and tedious examination and careful inspection of the printed records and printed briefs, and careful and serious consideration thereof and of able argument by counsel, the trial court approaches the issue as follows:

1. Does the evidence in the trial of this case prove that the legal services rendered by the defendant were rendered under the resolution of 1894?

2. If not, what is the reasonable value of said services as proven by the evidence?

As to the first question it is necessary to consider in detail some of the history of the former relations between the plaintiffs and defendant which in substance is not disputed.

The Cincinnati Southern Railway is a municipally owned railroad, but operated by a private company to which it is leased. The road was constructed under an act passed in 1869, together with certain amendatory and supplementary acts. By the act of 1869 power was given to the Superior Court of Cincinnati to appoint a board of trustees, whose duty it was to construct the road with the money raised by issues of bonds of the city authorized by different acts and aggregating $18,300,000. In 1877 an act was passed authorizing the trustees to lease the road, and in pursuance of such authority the trustees, in 1881, leased the road to the Cincinnati, New Orleans & Texas Pacific Railway Company, and under legislation of April 23, 1898 (93 O. L., 637), the lease was modified and extended in 1902, and this company still continues as lessee to operate the road. The lease, with the subsequent modification, is fully set out in *Cincinnati* v. *Ferguson,* 12 Ohio Dec., 439, affirmed by the Supreme Court April 1, 1902.

In clause 9 of the lease it was covenanted that in addition to the rental, the lessee company would pay annually the sum of $12,000 "to cover the necessary expenses devolving on said trustees in conducting their trust," and this provision remains in the subsequent modification of the lease made in 1901 under a law passed in 1898.

Notwithstanding the heavy financial burden which the city had assumed in the construction of the road, it had not provided sufficient terminals. Subsequently a plan was evolved and authorized by the act of 1898, by which the trustees were authorized to borrow $2,500,000, to be expended in the construction of terminals, the lessee, however, to pay both the principal and interest on the bonds as they fell due. The arrangement required, however, a vote of approval by the people, which it received.

In securing these terminals it was found necessary to secure by condemnation or agreement two large tracts of valuable

property in the city of Cincinnati; one consisting of six blocks bounded by Vine street on the east, Elm street on the west, Water street on the south, and Commerce street on the north; and the other a large tract in the northwestern part of the city. The amount expended in acquiring these properties was, in round numbers, $1,500,000, the largest amount involved in a condemnation proceeding in the history of the city, and the labor connected with the acquisition of the property was entrusted to the defendant. It is for services thus rendered that the defendant is seeking in this proceeding to have reasonable and proper compensation awarded to him, and which he contends should be twenty-five thousand dollars.

By resolution of the board passed in 1873, the defendant was appointed attorney for the board at a salary of $600 per annum, to hold during the pleasure of the board.

In 1877 the salary was made $100 a month, subject to the further order and pleasure of the board; and he continued to act under this last resolution until 1887, when he ceased to be an attorney of the board.

On April 7, 1894, he again accepted employment from the board of trustees under the following resolution which it passed, and this is the resolution now in dispute:

"*Ordered*: That W. T. Porter be and he is hereby appointed attorney for the board at a compensation of $50 per month, subject to the will and pleasure of the board, both as to term of service and rate of compensation."

At the time of his employment to act for the board in acquiring the terminal property under the modified lease provided for in the act of 1898, and the expense of which was to be borne by the lessee, the defendant was still acting under the resolution of 1894.

The compensation paid under the resolutions of 1873 and 1877 was paid out of the funds arising from the sale of bonds, and was part of the expenses of the construction of the road; but the compensation paid under the resolutions of 1887 and 1894 was paid out of the $12,000 annually paid by the lessee

"to cover the necessary expenses devolving on said trustees in conducting their trust."

All of the money arising from the sale of the bonds had been expended, and there was no other source from which such compensation could be paid, and both the trustees and the defendant doubtless understood this fact, and that the amount of compensation provided for in the 1887 and 1894 resolutions had reference to this fund.

When the resolutions to which we will refer were passed in 1903 employing the defendant to act for the board in acquiring the terminal property, the expense of which was to be paid by the lessee company, a new fund had come into existence by reason of the act of 1898. This fund was known as the terminal fund, and all expenses, including attorneys' compensation, were to be paid out of that fund. The first resolution was passed on January 26, 1903, and reads as follows:

"*Resolved,* That the board of trustees of the Cincinnati Southern Railway, deeming the same necessary for said railway, hereby declare their intention of appropriating to the uses of the said railway for terminal facilities, and hereby condemn and appropriate to such public use the following described property, to-wit: (Here follows the description of six blocks of city real estate.) And the attorney of the board be and he is hereby authorized and instructed to institute the necessary proceedings and to apply to a court of competent jurisdiction in Hamilton county, Ohio, for an inquiry and assessment of the compensation to be paid to the respective owners of said property."

Action was begun at once in the common pleas court to appropriate this property. There were 116 different pieces of property and 280 parties defendant, and the value of the property as claimed by the owners exceeded $2,500,000.

The second resolution was passed January 28, 1903. Under it the defendant was instructed to begin proceedings to appropriate for terminal purposes in the northwestern part of the city, property owned by different persons of the approximate value of $175,000. Action in the insolvency court was at once begun.

It is contended by counsel for the board of trustees:

That the work done by the defendant, under these resolutions of 1903, was to be paid for under the resolution of 1894.

It is contended by counsel for the defendant:

(1)   That the resolution of 1894 related to services to be rendered to the board alone, and for which the board alone was to pay, its only source of payment being the $12,000 fund.

(2)   That the employment under the resolution of 1903 had reference to services to be rendered in acquiring terminal property to be paid for out of the terminal fund, which fund, while created in the first instance by issuing the bonds of the city of Cincinnati, was in reality the fund of the lessee company which paid the interest and principal of the bonds.

(3)   That the resolution of 1894 would authorize the board to increase or decrease the compensation of defendant to a greater or less amount than $50 a month, *provided* such increase or decrease were made *before* the work was done, and such increase or decrease had been agreed to by defendant, but no increase or decrease could be made *after* work had been done at the rate of $50 a month, for the reason that the contract in force at the time the work was done would be binding upon the board, and they could not pay less than the contract price without infringing the rights of the defendant, and they could not pay more than the contract price for the reason that, being public officials, they could not give away money by paying more than their contract obligated them to pay.

(4)   That there is no authority given to the board by the contract, arbitrarily, *after* work is done, to add to the $50 a month such amount as the board saw fit.   Any contract by public officials which contained such a provision would be against public policy, illegal and void, as opening the door to the perpetration of fraud by public officials in favor of favorite contractors.

(5)   In view of the above stated principles and the subsequent conduct of the board and the defendant, it is apparent that both the board and the defendant understood at the time he entered upon the services called for by the resolutions of

1903 that he was to be paid therefor such amount as the services were reasonably worth.

Now this question presents itself, did the resolution of 1894 cover services to be rendered by the defendant in acquiring property for these terminals? We are inclined and feel that there is some force in the contention of counsel for the defendant that the provision in the original lease imposing all of the expense of acquiring terminals upon the lessee company as found in clause 10 of the original lease did not include services rendered by defendant or any other counsel under the resolution of 1894, which reads as follows:

"To provide lands in the city of Cincinnati, or at other points or places on the line of said railway, for workshops, depots, and other terminal facilities and the rights of way thereto, or for the purpose of changing the location or grade, or of providing additional side tracks, or other appendages of said railway, or for other like purposes:

"It is therefore mutually covenanted and agreed by and between the parties hereto, that whenever it shall be found necessary for any of the purposes aforesaid, and the said party of the first part (the board of trustees), have the lawful power and authority to do so, they shall and will, upon the request of said party of the second part (the railroad company) at the proper cost and expense of the said second party, and without any deduction from the rents and other payments herein reserved and to be paid by said party of the second part, acquire or enter upon, take and appropriate such lands and rights as may be necessary for the purposes aforesaid."

In 1898 an act was passed enabling the board of trustees to extend the original lease upon such terms as seemed to them proper; and also authorizing the issue of $2,500,000 in bonds of the city by the board of trustees for the purpose of acquiring terminal facilities, provided an agreement was made with the lessee by which the principal and interest of the bonds were to be paid by the lessee by way of additional rental (93 O. L., 637).

In pursuance of the authority granted by said act, two agreements in 1902 were entered into by the board of trustees and the lessee company; the one agreement was a modification and

extension of the lease; and the other agreement provided for the issue of the terminal bonds. These agreements also provided that the lessee should have the right to determine "the location, dimensions of the real property acquired, and the plans for all structures erected and all improvements made from such funds."

The bonds to be issued were the bonds of the city of Cincinnati, which could be sold at a better price and with a lower rate of interest than bonds of the railroad could be sold for, and this was the purpose in so issuing the bonds, which nevertheless the lessee company was to pay, both principal and interest. These two agreements required for their validity that they should be approved by a popular vote, which was done. *Cincinnati v. Ferguson*, 8 N. P., 361; *Cincinnati v. Ferguson*, 12 Ohio Dec. (N. P.), 453 to 456.

The agreement for the modification and extension of the lease provided in Section 13, as follows:

"The original lease, dated October 11, 1881, is to remain in full force during the term therein granted and during the extension thereof hereby granted, except so far as the same is modified by this indenture, and the said party of the second part for itself, its successors and assigns, hereby covenants and agrees with the said party of the first part, its successors and assigns, that it will keep and perform all the covenants, stipulations and agreements thereof and of this indenture, and will not evade or violate any of the same."

Section 3 of the modification and extension of the lease provides as follows:

"That any additional track, whether additional main track or additional side track, which may be constructed by the said party of the second part, on or along the said line of railway shall be constructed on the right of way now owned or to be hereafter acquired by the parties of the first part, and become a part of the line of railway; and whenever it shall be found necessary that additional lands or rights of way be acquired for the purpose of constructing additional main or side tracks, that such additional lands or rights of way shall and may be acquired under the terms and conditions of clause 10 of said original lease, and the provisions of clause 10, of said lease are

hereby made applicable to the acquirements of lands and rights of way for such purposes."

These two clauses were also repeated in the mortgage deed subsequently made by the lessee to the trustees to secure the obligations of the lease (Sections 3 and 13 of mortgage).

Bearing in mind the original lease, the modified lease and the agreement to issue the bonds which were to be paid by the lessee, it seems apparent that it was the money of the lessee company which the defendant was spending in acquiring land for terminal facilities, as testified to by Mr. Edward Colston, counsel for the lessee company. When the defendant therefore proceeded, under the resolution of 1903, to acquire land for terminal purposes, "the cost and expense" of which were to be paid by the lessee, his services were, it would seem, necessarily to be paid by the lessee as a part of such "cost and expense." It is claimed that the amount thus far paid the defendant has been paid out of that fund, and any additional amount paid him will be paid from the same fund. It is claimed that unless some agreement was made by him as to what his compensation was to be, he was necessarily to be paid what his services were reasonably worth; and if he and the board of trustees were unable to agree as to what amount was reasonable, the question must be settled by the courts. Could it be settled against him by the mere fiat of the board of trustees?

To undertake to determine what his compensation should be for such services by referring back to the resolution of 1894 seems futile, because that resolution has no reference to such services.

It is claimed that the resolution of 1894 had no application to the services rendered by the defendant in 1903 and 1904, under the law of 1898, for the reason that in 1894 the only amount remaining in the hands of the board of trustees was $1,984.12, and the power of the board to exercise the right of eminent domain was limited to that amount. Did the resolution of 1894 therefore contemplate and had it application to the rendering of services under the law of 1898 (not then in existence) which involved the expenditure of $2,500,000 to be paid by the lessee company?

It appears from the testimony of the defendant in the record and also from the modified lease entered into under the law of 1898, that all of the money authorized by the different acts for the construction of the road had been expended long before 1894, except $1,984.12.

At the time the resolution of 1894 was passed, therefore, the board of trustees probably had no power to exercise the right of appropriation of property to a greater extent than $1,984.12.

When the resolution of 1894 was passed did the board or the defendant have in contemplation services to be rendered under an act of the Legislature to be passed four years later, by which act the board was to exercise the power to appropriate property to an amount of $2,500,000, with money furnished by the lessee company?

Preliminary to a more direct consideration of the above proposition, we must bear in mind two general propositions of law.

(1)    That in the construction of a contract the court will take into consideration all of the surrounding circumstances.

In *Chamberlain* v. *Painesville R. R.*, 15 O. S., 243, the court, in seeking the construction of a contract, said:

"What, then, is the intention of the parties, as therein expressed, and to be gathered from a fair construction of the language employed? In answering this question, the situation and relation of the parties to each other, the object sought to be attained and the subject-matter to which the agreement relates, are material, and, in cases like the present, we might say, indispensable aids in guiding us to the correct construction."

In *Mosier* v. *Parry*, 60 O. S., 388, it is declared that:

"Where the language of a contract is of doubtful import, it is proper to ascertain the circumstances which surrounded the parties at the time it was made, the object intended to be accomplished and the construction which the acts of the parties show that they gave to their agreement, in order to give proper construction to the words that they used in the instrument and to determine its legal effect."

In *Kinney, Assignee,* v. *Commissioners of Hamilton County,* 8 C. C. Rep., 433, syllabus 2, it is said:

"The people as a body can only act toward one of their number in honesty and fairness, and whether a construction of a contract makes it reasonable and just, or otherwise, is a matter to be taken into consideration by a court, and such construction will be given to the agreement, if possible, as leads to justice between the parties."

On p. 437 it is said:

"Can it be claimed that this was a contingency that was contemplated by the county at the time of making the contract? We have a right to assume that the contractor was a person of some intelligence, possibly a man of ordinary intelligence. If so, can it be supposed that he would enter into a contract of such a character?"

In *Bank* v. *Insurance Co.*, 83 O. S., 330, as late as 1911 our Supreme Court said:

"The courts must construe the contract as nearly as may be to effect the purposes of it, and to meet the intentions of the contracting party at the *time* of the execution of the contract."

The power of eminent domain is an exercise of sovereignty; the Legislature can exercise such power only to the extent that it is delegated by the sovereign power; and this power is exercised by the Legislature by delegating authority to pay for and take property. The board of trustees, therefore, probably could only take and pay for property to the extent that authority was given to take and pay for and no further. *Giesy* v. *C., W. & Z. R. Co.*, 4 O. S., 308; *Foote* v. *Cincinnati*, 11 Ohio, 408, 410. Furthermore, as stated in *Currier* v. *Marietta & Cincinnati Ry.*, 11 O. S., 228:

"There is no rule more familiar or better settled than this: that grants of corporate power, being in derogation of common right, are to be strictly construed; and this is especially the case where the power claimed is a delegation of the power of eminent domain, one of the highest powers of sovereignty pertaining to the state itself, and interfering most seriously and often vexatiously, with the ordinary rights of property."

2. It is a well-settled principle that contracts made in pursuance of statutes or resolutions must be construed as though

such statutes or resolution had been embodied and incorporated into the contract; that the law of the land where the contract is made enters into the contract and forms a part of the same, and the scope and effect of the contract is determined by the law; and the parties to a contract are governed in their rights, - duties and liabilities under the same by that law.

In *Banks* v. *Dewitt*, 42 O. S., 263, it was held, syllabus:

"A contract made in pursuance of a statute or resolution must be construed as though such statute or resolution had been incorporated into such contract."

In the opinion, p. 274, the court said:

"The contract which provided not only for the publication of Volume 38, Ohio State Reports, but 'any other subsequent volumes of the Ohio Reports that may be ready for publication within two years from the 23d day of June, 1882,' must be construed in view of the statutes and resolutions relating to the matter."

In *Weil* v. *State*, 46 O. S., p. 450, at p. 452, the court said:

"The obligation of a contract is the duty which the law at the time of making it imposes upon the parties. As was said by Mr. Justice Washington in *Ogden* v. *Sanders*, 12 Wheaton, 213, 'The law of the contract forms its obligation.' Judge Cooley, in his work on Constitutional Limitations, p. 346, says: 'The obligation of a contract depends on the laws in existence when it is made; these are necessarily referred to in all contracts and forming a part of them as the measure of the obligation to perform them by one party and the right acquired by the other.'"

On p. 453, the court, in its opinion, says:

"Contracts must be expounded according to the law in force at the time they were made, and the parties are as much bound by a provision contained in a law as if that provision had been inserted in and formed a part of the contract."

In *Gimbert* v. *Heinsath*, 11 C. C. Rep., 339, syl. 1, the court held that:

"The law of the land where a contract is made enters into the contract and forms a part of the same; and the effect of the

contract is determined by the law, and the parties to a contract are governed in their rights, duties and liabilities under the same by the law, and by their contracts they make the provisions of the law that then enter into their contract obligatory upon themselves."

See also *State* v. *Netter*, 3 C. C., 369.

We are not unmindful of the forceful points presented in the very able brief submitted by counsel for plaintiffs on these issues.

The legislation relating to the appropriation of property by the board of trustees seems to leave little doubt that the board was ever granted the general power of appropriation; but was only granted such power so far as necessary in the expenditure of the money raised by the different bond issues; as only $1,984.12 remained unexpended when the resolution of 1894 was passed, can it fairly be said that it was within the contemplation of the board or the defendant that he was to render services four years afterwards, under a law not then in existence, in appropriation proceedings involving $1,500,000, which amount, including the costs and expenses, were to be paid by the lessee railroad company; and that for these services the board, which was not liable for them, was to pay him $50 a month, and no more unless they saw fit?

It is hardly probable that the defendant would have contracted to carry on appropriation proceedings involving a million and a half dollars for $50 per month, with the uncertainty of any additional compensation for service of such magnitude. To us it seems apparent that the action of the trustees in making payments in excess of $50 per month indicated their judgment and admission that the reasonable value of the services rendered by this defendant was what they were undertaking to pay him. The auditing committee said, in its report after defendant was appointed trustee, on the suggestion of settlement of defendant's claim:

"Mr. Porter's compensation had the earnest attention of individual members of this board at various times, previous to the admission of either of the members of your committee to the board, by trustees then living under which Mr. Porter ren-

dered the services. These were unable to come to any agreement with Mr. Porter as to his compensation. However, the minutes of this board show that the board did fix an amount as its idea of the value of Mr. Porter's services. * * *

"Your committee can not, under the circumstances, know as much about the value of Mr. Porter's services as members of the board under whom his work was done. In view of these facts, your committee hesitates about reviewing the decisions of the board."

And the committee recommended that it be *left to the court to decide.*

We. are of the opinion from the conduct and action of the plaintiff board of trustees and the defendant, and from all the evidence adduced in this case, after careful and serious consideration, that the board of trustees had no power under the resolution of 1894 *after* the services had been rendered to pay the defendant more than $50 per month. We find that said resolution of 1894 is not susceptible of such construction, and that if it was, it would be void against public policy, and illegal. The exact language of the resolution is:

"Ordered that W. T. Porter be and he is hereby appointed attorney for the board at a compensation of $50 per month, subject to the will and pleasure of the board, both as to term of service and rate of compensation."

We believe that the legal effect and purpose of this resolution of 1894 was to give the board the power to discharge the defendant as attorney whenever it saw fit, or while retaining him in its service, to reduce or increase his compensation. But such action of reduction or increase, we believe, *must be made before the services are rendered,* otherwise the only amount which the board could pay for such services would be $50 per month.

The contention that the true construction of the resolution of 1894 is that the board may increase the compensation after the service has been rendered above $50 a month, but can not at any time after the service has been. renderd reduce the amount below $50 a month, is clearly contrary to the express language of the resolution. The language of the resolution which is cited to sustain this construction is, "subject to the will and pleasure of the board both as to term of service and

rate of compensation." If it be conceded that under this language the board may increase the compensation after the services were rendered, it necessarily follows that they may also *decrease* the amount of compensation *after* the services are rendered. And yet counsel for the trustees deny that the board had the power to reduce the compensation. The construction contended for seems untenable.

The proper construction of the resolution being as indicated, it necessarily follows that if the services were rendered under this resolution, $50 was the maximum amount which was to be paid to the defendant. Any other amount paid to him would be paid illegally, and the trustees would be liable on their bonds for such payment. They can make no gift of public money.

The resolution of February 6, 1904, indicates that if it had been the intention of the board to reserve to itself the right to fix the compensation of the defendant in 1894, it would have used apt language to do so.

The resolution of February 6, 1904, reads as follows:

"*Resolved*, That from and after January 1, 1904, W. T. Porter be employed as attorney for the board, to be compensated for such legal services as he may render in matters referred to him by resolution of the board at a compensation to be fixed by the board."

The contention that after services rendered under the resolution the board of trustees had the right to pay such an amount in addition to $50 a month as in its discretion it might think proper, would make the resolution illegal as against public policy; and the court will not assume a construction of the resolution which makes it illegal, unless compelled to do so.

Unless there are statutory provisions prohibiting it, public officials may make contracts, when such contracts are within their contractual powers, and be liable on the same on a *quantum meruit*. No authority can be found which sustains the right of public officials to make a contract, reserving to themselves the right to fix arbitrarily the amount to be paid under the contract or which is still more iniquitous, to make a contract to pay a certain amount for services, and then arbitrarily

to increase that amount after the work has been performed or the service rendered.

The power to make such a contract would be fraught with the greatest evils.

If a person rendering services or doing work for public officials did not know what he was to receive for his work, depending solely upon the arbitrary whim of the officials with whom he contracted, the tendency on his part inevitably would be to protect himself by doing the work with as little labor as possible, and therefore in a degree, inefficiently; a result greatly against the public interest and welfare.

On the other hand, if public officials could arbitrarily fix the amount to be paid, or arbitrarily add to what had been fixed when the contract was made, the door would be open to all manner of favoritism and fraud. Dishonest officials and contractors would crowd honest contractors out of the field.

No case has been cited in which a contract which left to public officials the arbitrary power to determine what should be paid, has been upheld. The reason undoubtedly is that no public officials have ever before claimed to have such authority.

The test by which to determine whether a given contract is against public policy is stated in the Cyclopædia of Law and Procedure (9 Cyc., 481) as follows:

"The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance."

The full citation is as follows:

"It is perhaps not easy to give a precise definition of public policy. It is perhaps correct to say that public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be designated as it sometimes has been, the policy of the law or public policy in relation to the administration of the law.

"In other words, its validity is determined by its general tendency at the time it is made, and if this is opposed to the interest of the public, it will be invalid, even though the intention of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract and not its actual injury to the public in a particular instance."

Measured by this very reasonable test, can there be any doubt that a construction of the resolution of 1894, which the board puts upon it in order to justify its action, makes the resolution void as against public policy and makes the payments to the defendant over $50 per month illegal payments in the nature of gratuities given to him by the board?

The presumption always prevails that parties intend to act legally and not illegally, unless it appears clearly to the contrary. The presumption, therefore, is that the payments made to the defendant were not made under the resolution of 1894, but were payments made to reasonably compensate him out of the terminal fund.

To the contention just stated, the plaintiffs make the following answer:

"If the board had no authority to pay Mr. Porter more than fifty ($50) dollars a month, he is in no position to complain, as he has been benefited by the action of the board; the only result is that he has been overpaid."

This answer in effect is that as the defendant has already accepted in part payment more than $50 a month for his services, he is estopped to deny the right of the board to make such overpayment.

It assumes that the defendant dealt with the board on the assumption that the resolution of 1894 defined his right to compensation, and that both he and the board, knowing that under the resolution of 1894 the board could not pay him more than $50 a month, nevertheless did illegally make such extra payment to him, and that he with knowledge of this illegality accepted the same.

Both of these assumptions seem without any foundation. There is not a scintilla of evidence in this case that the defendant ever admitted that his rights were defined by the resolution of 1894. On the contrary, he claims that the resolution of 1894 had no reference to the services rendered by him and did not define his right to compensation. He contends that he was entitled to be paid what his services were reasonably worth, and the acceptance of any payment by him was always made and

conceded by the board to be without prejudice to his right to claim a greater amount.

The law is well settled that in order to furnish an occasion for the application of the principle of equitable estoppel, the person claiming estoppel must have been in some way deceived and in reliance thereon have changed his position to his detriment. Both of these elements are lacking here. Bigelow on Estoppel, pp. 604-681; Ewart on Estoppel, p. 10; *Steel* v. *Smelting Co.,* 106 U. S., 447, syl. 5, pp. 455-6; *American Tube Works* v. *Boston Co.,* 139 Mass., 5, 11.

The rule forbidding public officials to increase arbitrarily the compensation of a contractor or employee is different with respect to contracts between individuals. The courts uphold contracts between individuals in which it is expressly provided that nothing shall be paid for the thing or the work unless it is satisfactory to the purchaser. In those cases in which the object of the contract is to gratify taste, serve personal convenience or satisfy individual preference the courts have not had great difficulty in upholding the contract; but in all other classes of contracts, even between individuals, the courts will, if possible, construe the contract to mean that the purchaser only intends by the contract that he must be reasonably satisfied, and therefore the court holds that the test is—ought a reasonable man be satisfied? If, however, the contract declares otherwise, the court will enforce the contract, but every presumption is against such intention.

The work to be done by the defendant was not to gratify taste, serve personal convenience or satisfy individual preference, and even if the contract were between him and private individuals instead of public trustees, the presumption would be strongly against the construction contended for by the trustees, and a court will not give it such construction unless it clearly appeared that such a construction expressed the intention of both parties.

From the evidence we find that the *conduct of the parties* to this action in putting a practical construction on the contract of employment of the defendant, indicates the intention of both plaintiffs and defendant that the defendant shoud be paid what his services were reasonably worth.

If we examine the conduct of the parties subsequent to the resolutions of January, 1903, designating the defendant as the attorney to conduct the necessary proceedings to acquire property for terminals; and also the subsequent action of the parties with respect to this compensation, as throwing light upon the question as to whether either the board or the defendant supposed they were acting under the $50 a month resolution of 1894, we find that the subject of compensation to the defendant was not referred to until February 6, 1904, more than a year after the resolutions of January, 1903, employing him to act in the terminal matter.

The resolution of February 6, 1904, reads as follows:

"*Resolved:* That from and after January 1, 1904, W. T. Porter be employed as attorney for the board, to be compensated for such legal services as he may render in matters referred to him by resolution of the board at a compensation to be fixed by the board.

"*Resolved* further: That for legal services rendered by said W. T. Porter in the proceedings condemning property for terminals under resolution of January 24, 1903, the sum of fifty ($50) dollars a month be paid to him on account from and after January 1, 1904, out of the terminal fund, all subject to the right of the board to rescind these resolutions.

"*Ordered:* That the secretary transmit a copy of the foregoing resolutions to Mr. W. T. Porter."

A copy of these resolutions was transmitted to the defendant.

It may be observed in passing that if the resolution of 1894 gave the power to the board to fix the compensation as it saw fit, why pass the first of the resolutions of February 6, 1904? The board already had such power. Evidently the board was aware of the fact that the resolution of 1894 gave it no such power and was never intended to do so.

It will also be observed that the board asserts the right in the future to fix the compensation in matters to be referred to him; but it asserts no such right as to his compensation for services under the resolution of January 24, 1903.

It seems that these resolutions clearly make the distinction that the defendant acted in two capacities under instructions from the trustees. *First.* As attorney for the trustees to be

compensated by them out of the $12,000 paid to them by the lessee railroad company "in conducting their trust;" *Second.* As attorney in acquiring terminal facilities to be paid for out of the terminal fund, which was provided by the lessee railroad company.

For services rendered under the first of these resolutions he was to be paid out of the $12,000 fund; but for services under the second of these resolutions which related as it says to "proceedings condemning property for terminals under the resolution of January, 1903," he was to be paid out of the "Terminal Fund" and was to be paid fifty dollars a month from and after January 1, 1904, "on account."

It would seem that if the board had claimed the right to arbitrarily fix the compensation of the defendant, which was to be paid out of the terminal fund, it would have asserted that claim in the second resolution when the matter of his compensation first arose, as it asserted it in the first resolution with respect to his employment after January 1, 1904, for the board to be paid out of the $12,000 fund. Furthermore, the statement in the resolution that the payment therein provided for out of the terminal fund is to be "on account" is entirely inconsistent with the claim that he was to be paid only such an amount as the board might fix. A person can have no "account" against another who has the right to fix his compensation; but an account implies not only a claim, but an *obligation* to pay.

On or about September 24, 1904, the board again took action with respect to the defendant's compensation by adopting the following resolution:

"*Ordered:* That there be paid to W. T. Porter, attorney for the board under the resolution of the board passed February 6, 1904, the sum of one thousand ($1,000) dollars on account for legal services rendered in the condemnation proceedings in case No. 125,432 Common Pleas Court, *Trustees* v. *Hooker et al.*"

Here again the board seems to be recognizing not only a claim by the defendant, but an obligation on its part to pay by stating that the $1,000 is to be a payment "on account."

On November 7, 1904, the board seems to give further evi-

dence of its recognition of its obligation to pay what was reasonably due, by adopting the following resolution:

"That the President be requested to obtain the bill from W. T. Porter, attorney, for his services in the condemnation proceeding case No. 528, *Trustees* v. *Hickenlooper et al*, Insolvency Court, Hamilton County, Ohio, and case No. 125,431, *Trustees* v. *Hooker et al*, Hamilton Common Pleas Court."

In obedience to this resolution the defendant presented his "bill" with explanatory letter.

If the board had the right to arbitrarily fix the compensation of a person, it is entirely inconsistent to find it calling upon such person to present his "bill." His "bill" would be what he claimed they owed him. If they had the right to fix his compensation, the board might consistently ask for his "opinion" or "suggestion" as to what they ought in justice to pay him, but not for his bill.

The two following resolutions were subsequently passed January 30, 1905:

"The board of trustees having considered what additional allowance should be made to W. T. Porter for services rendered under the resolutions of January 24, 1903, and January 31, 1903, providing for the appropriation of property for terminals, on motion it was

"*Resolved*, That there be allowed and paid under proper voucher to said W. T. Porter the sum of $6,050 in addition to the sum heretofore allowed and paid to him on account of services; said sum of $6,050 to be paid out of the new terminal facilities fund and to be in full of all services rendered under said resolutions."

The defendant did not accept this allowance and this action resulted.

May 7, 1908:

"*Resolved*, That the sum of $5,000 be paid to said W. T. Porter, on account of additional allowance made to him January 30, 1905, for services rendered under the resolutions of January 24, 1903, and January 31, 1903, providing for the appropriation of property for terminals; such payment to be made by the trustees and to be accepted by W. T. Porter without prejudice to the rights of either party in the case of the *Trustees of the Cincinnati Southern Railway* v. *W. T. Porter*, No. 53054, Superior

Court of Cincinnati; further than that the said amount so paid shall be a credit on any amount adjudged to W. T. Porter by the court in said case.''

It has been urged against the defendant that in presenting his bill for $25,000 dated December 1, 1904, he gave credit for $1,100 paid him at the rate of $50 a month for the months subsequent to the resolution passed the latter part of January, 1903, employing him in the appropriation proceedings, and that by giving such credit he admitted he was working under the resolution of 1894.

The resolution of February, 1904, recited that he was to be paid ''on account'' for services in the appropriation matter $50 a month out of the terminal fund, beginning January 1, 1904. As his bill was presented December 1, 1904, he credited $50 a month paid during the year 1904 for the eleven months up to December 1, 1904. It is admitted that this credit amounting to $550 was proper.

It is contended, however, that in giving credit for $50 a month for eleven months from February to December, inclusive, in 1903—the resolution to appropriate having been passed in the latter part of January—he admitted that he was working in the appropriation matter under the resolution of 1894, which provided for compensation at $50 a month.

The bill presented by the defendant was for $25,000. If he had admitted he was working under the resolution of 1894, he could have presented no ''bill'' except for $50 a month, and this amount had already been paid him.

The entire time of the defendant was occupied in 1903 in working on the appropriation matter, and he gave the board practically no service except in this matter. He therefore doubtless thought it the fair thing to do to give credit on his ''bill'' for all the money he received on the order of the board during that period; although had he insisted strictly on his rights, he would not have been obliged to give credit for services in the appropriation matter of the $50 a month paid him during the year 1903 by the board out of its $12,000 fund.

We have given careful consideration to the several logical and strong points presented by the helpful and comprehensive brief

of counsel for plaintiffs, but we are of the opinion from the evidence in this case that the labors of the defendant were so onerous and exacting, and the responsibility in connection therewith so great and important as to indicate conclusively that the services were not rendered pursuant to the resolution of 1894, which provided for payment at $50 a month, and that the trustees and defendant themselves thus treated the entire subject by their conduct.

It follows, therefore, and we find from the evidence in this case, that the resolution of 1894 did not fix the value of the services for which defendant makes claim and that he is legally entitled to moderate and reasonable compensation. We believe, and so find, that the evidence in this case proves that the defendant rendered the services in question not in pursuance of said resolution of 1894.

The next question, therefore, is, "what is a moderate, reasonable amount to be allowed to the defendant as compensation for the legal services rendered herein?" To begin with, we find that the learned former judge of this court on the initial hearing of this cause, said (see *Railway* v. *Porter*, 12 N.P.[N.S.], p. 631) that, after considering the nature of the work done, the amount of it, the amount of money involved, the time actually consumed, the skill and ability required and displayed and the responsibility, particularly in the matters involving examination and report on the certificates of title and considering also the amounts actually saved by the defendant's negotiations out of court, as well as by actual trial work, even conceding that in many matters he had the assistance and co-operation of others, this amount finally awarded by the board, in said court's judgment, *was none too liberal*. It seems evident that said court felt satisfied that the amount allowed by the board of trustees to the defendant of $8,150 was not a moderate or reasonable sum.

In order for us now to determine what sum shall be regarded as a moderate and reasonable sum we must consider all the evidence tending to prove the onerous and exacting character and nature of these legal services, the amount of money involved in the case, the time actually consumed in the trial, the ability and

skill of the defendant required and manifested; we must consider the responsibility particularly in the matters involving examinations and reports on the certification of titles, also the amounts actually saved by the negotiations of this defendant out of court, as well as by actual trial work; the beneficial results coming to the trust directly due to defendant's efforts, etc. Of course, we must consider that in many of these matters the defendant had co-operation and assistance of others.

In support of the claim for services rendered by the defendant of $25,000, the defendant maintains his contention as to value by his own testimony and by the testimony of certain prominent, able and leading members of this bar, viz.: Mr. Lawrence Maxwell, Jr., Mr. Wade H. Ellis, Mr. L. C. Black, Mr. Louis Kramer, Mr. John C. Healy, Mr. Jonas B. Frenkel and Mr. Byron M. ClenDening. Only two witnesses testified on behalf of the plaintiffs, Judge John R. Sayler, one of the trustees herein, and Mr. Edward Colston, who was one of counsel for plaintiff and of the C., N. O. & T. P. Railway Co., lessees of the Southern Railway. Four of the attorneys who testified for the defendant represented clients who had owned part of the property which was acquired in this very condemnation suit and were personally familiar, in part at least, with defendant's services, and surely were in a good position to put a value on them.

In round numbers the value of the property involved in this condemnation was one million and a half dollars. Negotiations were carried on in reference to one hundred and thirty-seven pieces of real estate; the defendant adjusted and settled for all of this property out of court except eight or ten pieces—more than one hundred lawyers were dealt with; the negotiations extended over a period of six months; the value of the property acquired by negotiation amounted to $1,331.000; trial was had as to the remainder, the value of which approximated $100,000; the trial required about two months; action for a new trial was filed; before the trial came on there were preliminary hearings on motions and demurrers and at the end of two months a verdict was rendered and motion for a new trial followed; some of the parties settled, but trial was then had as to the remain-

ing two pieces lasting ten days; motion for new trial was filed and argued; a bill of exceptions was prepared in one case, and the verdicts rendered amounted to $97,000. We find that an abstract company furnished statements as to one hundred and thirty-seven pieces of realty involved; the defendant expressed his opinion in writing on each piece as to the soundness of title; he prepared all the deeds and had them executed. The original verdict was rendered in July and in order to enable the plaintiff to get funds it expected to get, defendant succeeded in having the judgment entered six months later, which gave it an additional six months in which to take the property. Finding that it had not enough money the defendant negotiated leases with the property owners for some $189,000, the effect of these leases being to relieve the plaintiff for that time in taking over said property. The holders of about $50,000 of property covered by verdicts wanted their money and the defendant negotiated with a bank for a loan of said amount for the plaintiffs. After the verdict had been rendered and judgment entered, a fire destroyed a number of pieces of property and the defendant secured an abatement of $28,000.

The four attorneys who were in part familiar with the services of the defendant gave the following opinions as to value: Mr. John C. Healy fixed the amount at $30,000 to $40,000; Mr. L. C. Black, $32,000; Mr. Wade H. Ellis, $30,000 to $35,000; Mr. Jonas B. Frenkel, $27,750. Three other attorneys testified that the reasonable value of defendant's services was as follows: Mr. Lawrence Maxwell, $25,000; Mr. Byron M. Clen Dening, $15,000 or $20,000 and Mr. Louis Kramer, $36,000.

Mr. John C. Healy says that the defendant was very tenacious in getting the figures down on his clients' property for the benefit of the plaintiff trustees; that he put him to a great deal of trouble and although at first they were very far apart on values, through the efforts of defendant they finally got together and adjusted the matter amicably.

Mr. L. C. Black represented a number of clients in this condemnation suit. As to one piece his client claimed $50,000, but after negotiations with defendant he took $32,000. On the other piece defendant finally closed negotiations reducing Mr.

Black's claim from $20,000 to $15,000. Mr. Black says that he had a great number of negotiations with defendant about these cases and he testifies that defendant exercised highly skillful methods in his conduct.

Mr. Byron M. ClenDening had had special experience in condemnation proceedings, having acquired the property for the Cincinnati Interterminal in 1903 and 1904, beginning with the C. & O. Bridge along Front or Third streets, taking all the property on Third street back to Webb Alley and crossing Baymiller street, taking the front of the block at the southeast corner of Baymiller and Fifth streets and going over to the C., H. & D. Railway. He was also of counsel in the L. & N. condemnation case in the Public Landing cases. With this actual experience much credit and consideration should be given to Mr. ClenDening's opinion and statements.

Mr. Lawrence Maxwell, Jr., one of the foremost attorneys in the United States, gives, from his experience and knowledge, detailing his reasons and fixing the amounts, his opinion that the amount asked for by defendant is a fair, moderate and reasonable sum. He takes into consideration the fact that these services of the defendant redounded to the benefit of the city and therefore the charge should be moderate.

Mr. Louis Kramer, a member of this bar for more than forty years, after taking into consideration the long experience, reputation and technical schooling of the defendant in this kind of work, the magnitude of the transaction, the results achieved and all the other elements involved, gives his opinion of the value of the services at $30,000 to $35,000.

Mr. Wade H. Ellis divided the defendant's work into three parts—the negotiations of the bulk of this property $1,300,000, examining the abstracts and passing upon the titles to 137 pieces of property, and the court services. He believes all this to be worth from $25,000 to $27,000. Mr. Ellis was familiar with the work having represented the Wm. Glenny Glass Company in this condemnation suit in its claim of some $100,-000. He says he thought the defendant exhibited much skill and labored to the advantage of his trust.

Mr. Jonas B. Frenkel also represented a client involved in this condemnation suit. He had the experience of being counsel for the board of water works trustees of Cincinnati for about ten years, having taken part in various litigation of this nature and was familiar with the difficulties attendant. He testified detailing the various values for the services rendered giving as his opinion the sums of from $25,000 to $30,000.

With the evidence before us of the defendant himself and Mr. Lawrence Maxwell, Jr., Mr. Jonas B. Frenkel, Mr. L. C. Black, Mr. Wade H. Ellis, Mr. Byron M. ClenDening, Mr. Louis Kramer, and Mr. John C. Healy, all lawyers of good standing, experience and ability at this bar, together with the evidence submitted as to the nature of this work done, the amount of it, the amount of money involved, the time actually consumed, that these services were onerous and exacting, the skill and ability required and displayed, the great and important responsibility particularly in the matters involving examination and report on the certification of titles and considering also the amounts actually saved by the defendant's negotiations out of court, as well as by actual trial work, even conceding that in many matters he had the assistance and co-operation of others and considering the testimony of the *only witnesses against the defendant's claim,* Mr. Edward Colston, who acted in the capacity both of counsel for plaintiff and counsel for the lessee company, and of Judge John R. Sayler, one of the plaintiff trustees who says that *a lawyer who gets $5,000 in any case, irrespective of the services, is well paid,* and the basis and reasons for their opinions as to value, we must and do come to the conclusion that the amount $8,150 allowed to the defendant by the board of trustees is not a fair, moderate or reasonable sum in payment therefor.

However, we do feel that the sum to be allowed to this defendant for his services rendered to this public trust should be a moderate amount, perhaps more moderate than should be allowed if he were representing an individual or private concern; it should be fair but not generous, and we have this phase of the case in mind in arriving at a conclusion as to what is to be allowed.

We have considered this case seriously, carefully and at considerable length, have given attention to the voluminous printed record of nearly 400 pages, the pleadings, and the very helpful and masterful briefs of counsel, and have considered the value of the services in question from various angles. We have finally concluded that out of justice and fairness the defendant is entitled to $8,850, with interest from December 1st, 1904, in addition to the sum previously allowed by the plaintiff board of trustees.

A decree in accordance with this finding may be taken.